**UNITED STATES of America,**
**Plaintiff,**

v.

**State of MINNESOTA; and Minnesota Department of Revenue,**
**Defendants.**

**No. Civ.98–2127(DWF/AJB).**

United States District Court,
D. Minnesota.

May 31, 2000.

David M. Katinsky, Tax Division, Department of Justice, Washington, D.C., for plaintiff.

Stephen F. Simon, Assistant Attorney General, St. Paul, MN, for defendants.

## MEMORANDUM OPINION AND ORDER

FRANK, District Judge.

### Introduction

This case poses a problem endemic to our federal system of government: the apparent conflict between a broad system of federal regulation and a detailed state regulatory scheme. The tension is exacerbated in this case, however, because the apparent conflict bears directly on men and women who serve the people of the United States—officers of the Public Health Service. After carefully examining the arguments made by the parties, the Court is convinced that the State of Minnesota cannot, as a matter of law, presume Public Health Service officers are domiciled in the State of Minnesota solely because their spouses are considered to be. However, the Court is equally convinced that the State may consider other factors as indicative of domicile without categorically running afoul of federal legislation.

### Background

In 1940, Congress passed the Soldiers' and Sailors' Civil Relief Act ("SSCRA") in order to protect servicepeople from the deleterious financial consequences which could arise from being assigned to duty away from home. Members of the Commissioned Corps of the Public Health Service ("PHS") fall within the SSCRA's ambit. See 42 U.S.C. § 213(e). PHS officers, who typically possess some skill related to the medical field, serve in all 50 states and over 550 locations across the globe. PHS officers work for a variety of agencies, such as the Bureau of Prisons and the Indian Health Service. Quite often, a

PHS officer's tour of duty at a given location will be quite lengthy—which, in large part, gives rise to the problems presented here.

The core of this case concerns attempts by the Minnesota Department of Revenue ("DOR") to tax the income of twelve PHS officers who are posted within the State of Minnesota, yet claim domicile elsewhere. Regulations and presumptions developed by the DOR provide the basis for this attempted taxation. The most important is the presumption contained in Minn.Rule 8001.0300, subpart 2, which establishes that the domicile of one spouse is presumably the same as that of the other absent evidence to the contrary. The DOR also looks to a number of other factors—twenty-six in all—in determining the domicile of a person resident in Minnesota, including location of living quarters (8001.0300, subp.2(F)), jurisdiction by which one is licensed to drive (2(J)), jurisdiction in which a vehicle is registered or located (2(M)), and the location of "social, fraternal, or athletic organizations or clubs or a lodge or country club" to which a person belongs (2(U)). The United States claims the SSCRA preempts each of these five factors as applied to PHS officers.

In its Complaint, the United States discusses the DOR's treatment of three PHS officers in particular in order to illustrate the manner in which these presumptions conflict with the effectuation of the SSCRA. In their pleadings, the parties asked the Court to rule on preemption as a matter of law, without making any merit-based determinations of the propriety of application as it pertains to particular PHS officers.[1] However, because some examination of these factual settings may prove useful to demonstrate the problems inherent in applying the challenged Minnesota regulations to the PHS officers, the situations of these officers will be highlighted. The first is Commander Steven Forthun, a civil engineer who has been assigned to the Indian Health Service in Bemidji, Minnesota, from July 1991 to June 1998. From 1987 to 1990, Forthun had been assigned to a post in Anchorage, Alaska. Although he and his wife had previously intended to return to their home state of Oregon upon the termination of his career with the PHS, Forthun decided during this time that he and his wife wished to make Alaska their permanent home.[2] (*See* Forthun Dec. ¶2.) While in Anchorage, Forthun took a number of steps traditionally associated with establishing domicile: he registered to vote in Alaska, registered his car there, applied for Alaska hunting and fishing licenses, and achieved certification as a civil engineer in the state. He also amended his State of Legal Residence Certificate (DD Form 2058)[3] to record that he considered himself an Alaska resident. In 1990, Forthun and his family moved to North Dakota, in order that Forthun could earn a master's degree in environmental engineering. In 1991, Forthun asked the PHS to re-assign him to a duty station in Alaska. However, no opening was apparently available, and Forthun was told to accept any assignment open. Forthun maintains he still considered himself an Alaska domiciliary. (*See* Forthun Dec. ¶6.)

In 1991, Forthun accepted the posting in Minnesota. His family accompanied him to Bemidji. The couple purchased a home

---

1. Although the United States appears to have changed course at oral argument, at which time it urged the Court to consider the merits involving the three primary PHS officers at issue and argued that such consideration was necessary to determine the legal issue of preemption. However, because a determination on the merits was not originally contemplated, and because a ruling of law is possible without such as-applied determinations, the Court declines to do so.

2. The primary motivation here is obvious: Alaska, unlike Minnesota, has no state income tax.

3. DD 2058 is a record by which the Department of Defense keeps track of a serviceperson's domicile.

in Donna Forthun's name alone—a move which Forthun contends was carefully planned to show his intention to remain an Alaska domiciliary. (*See id.* at ¶ 13.) Forthun retained his Alaskan voter registration, he continued to register his car in Alaska, he listed Alaska as his residence on his federal W–2 form, and he did not apply for a civil engineering license in Minnesota. He did, however, receive a Minnesota driver's license and a Minnesota resident hunting permit. (*See* Ames Aff. ¶ 9.) Forthun unsuccessfully requested a transfer back to Alaska in 1993 and 1996.[4]

In 1995, the DOR, which had been investigating the residence statuses of PHS officers in Bemidji, informed Forthun that it considered him a Minnesota domiciliary for the tax years 1991 and 1992, and assessed him back taxes, penalties, interest, and other charges in the amount of $4,028. The DOR based its finding on Forthun's Minnesota driver's license, his Minnesota resident hunting license, and the fact that his wife was a Minnesota resident. (*See id.* ¶ 9.)

Commander Wayne Potter was assigned to a post in Red Lake, Minnesota in 1981. He was later transferred to Bemidji in 1988. Potter claims Alaska as his state of residence as well. Mt. Edgecumbe, Alaska, was Potter's first duty post from the time he joined the PHS in 1979 until his transfer to Red Lake. While in Alaska, Potter and his wife determined that they wished to return to Alaska when Potter's service ended. (*See* Potter Dec. ¶ 3.) Since his posting to Red Lake and Bemidji, Potter has informed both the PHS and the DOR that he considers Alaska his state of residence. He retains his voter and vehicle registration in Alaska. While in Minnesota, he has purchased nonresident hunting and fishing licenses. His only substantial tie to Minnesota has been his wife, a resident of Minnesota who receives

homestead tax credits. (*See* Ames Aff. ¶ 10.)

In 1995, the DOR informed Potter that it considered him a Minnesota resident for the tax years 1988 to 1991, and assessed him a liability of $6,500.20. The DOR based its finding as to Potter on the fact that, like Forthun, his wife was a Minnesota resident and on the fact that Potter failed to receive the annual dividend paid to Alaska residents. (*See id.*)

The third PHS officer, Captain Bruce Etchison, claims not Alaska but Indiana as his domicile. Etchison was raised and attended college in Indiana. When he joined the PHS in 1978, Indiana was his home state. (*See* Etchison Aff. ¶ 2–3.) In 1988, Etchison and his family moved to Bemidji after the PHS assigned him a post there. Despite this, Etchison has continuously insisted that Indiana is his state of domicile (*See id.* ¶ 11.) Like Forthun and Potter, Etchison has also maintained significant contacts to the other state in question. His driver's license is issued by Indiana, and his automobile is registered in that state as well. He has continued to vote by absentee ballot in Indiana. He claims membership in a Lutheran church in the town in which he grew up. Finally, Etchison continues to pay Indiana state income tax despite his absence from the state. (*See id.* ¶ 7.)

In 1995, the DOR informed Etchison that it considered him a Minnesota resident for the years 1991 and 1992, and assessed him a liability of $5,147.87. As was the case with Forthun and Potter, the DOR attached great weight to Etchison's wife's Minnesota residency. It also relied on the fact that Etchison "was heavily involved in certain community affairs in Minnesota"—namely, his leadership of the Bemidji Youth Baseball League. (*See* Ames Aff. ¶ 11.)

---

**4.** Forthun finally received a transfer to Alaska in 1998. He and his family no longer reside in Minnesota.

In addition to these three, nine other PHS officers were issued orders deeming them liable for income taxes for years in the late 1980s and early 1990s. The officers all appealed their orders to the DOR's administrative appeals division. Of these twelve, the DOR has issued only an appeals order as to Forthun, which affirmed his tax liability for 1991 and 1992 on the basis of his Minnesota driver's license, his resident hunting license, and the Minnesota domicile of his wife. (*See* Order, October 20, 1997, Lee Aff. ¶ 6.) The remainder of the cases appear to have been held in abeyance pending the resolution of Forthun's appeal. In 1998, the United States filed suit in this Court, seeking a declaration that the SSCRA preempts the DOR regulations used to assess tax liability against the PHS officers. Both parties have now moved for summary judgment.

## Discussion

### A. Standard of Review

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). *Landon v. Northwest Airlines, Inc.,* 72 F.3d 620, 624 (8th Cir.1995). The court must view the evidence and the inferences which may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. *Enterprise Bank v. Magna Bank,* 92 F.3d 743, 747 (8th Cir. 1996); *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Enterprise Bank,* 92 F.3d at 747. Summary judgment must not be granted if a factual dispute is "genuine," meaning that the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S.

242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

The Court's function at the summary judgment stage is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2511. Credibility determinations, weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of the Court at the summary judgment stage. *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513. The evidence of the nonmoving party is to be believed and all justifiable inferences are to be drawn in its favor. *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513.

### B. Preemption.

We live in a federal system, in which state laws which "interfere with or are contrary to" federal law are invalid. *Hillsborough County v. Automated Medical Laboratories, Inc.,* 471 U.S. 707, 712, 105 S.Ct. 2371, 85 L.Ed.2d 714 (1985). The Supremacy Clause, Art. VI, cl. 2, demands no less. "This Constitution, and the Laws of the United States ... shall be the supreme Law of the Land; and the judges in every State shall be bound thereby, and any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const., Art. VI, cl. 2. To the extent that a state law is in "irreconcilable conflict" with federal law, the state law is preempted. *See Barnett Bank of Marion County, N.A. v. Nelson,* 517 U.S. 25, 31, 116 S.Ct. 1103, 134 L.Ed.2d 237 (1996). When a state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," such an irreconcilable conflict is present. *Id.* at 31, 116 S.Ct. 1103.[5]

However, preemption is "strong medicine," which should be "not be lightly pre-

---

5. The parties agree on the applicable standard by which to examine the interplay between the SSCRA and the DOR regulations, thus saving the Court from the most difficult task in any case involving claims of preemption.

sumed." *California Fed. Sav. & Loan Ass'n v. Guerra,* 479 U.S. 272, 281, 107 S.Ct. 683, 93 L.Ed.2d 613 (1987). Whenever possible, a federal law and a state system of regulation should be read in tandem, so as to avoid finding the latter preempted. *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Ware,* 414 U.S. 117, 127, 94 S.Ct. 383, 38 L.Ed.2d 348 (1973). This is particularly true when the state law or regulation at issue touches upon traditional areas of state sovereignty, such as taxation. *See California v. ARC America Corp.,* 490 U.S. 93, 101, 109 S.Ct. 1661, 104 L.Ed.2d 86 (1989).

### 1. Purposes and Scope of the SSCRA.

Before turning to examine whether the Minnesota revenue presumptions at issue actually frustrate the fulfillment of the SSCRA's purpose, we must first examine the SSCRA itself and the interpretation given it by case law. In relevant part, section 514 of the SSCRA reads:

(1) For the purposes of taxation in respect of any person, or of his personal property, income, or gross income, by any [State], such person shall not be deemed to have lost a residence or domicile in any [State] *solely* by reason of being absent therefrom in compliance with military or naval orders, or to have acquired a residence or domicile in, or tho have become resident in or a resident of, any other [State] while, and *solely by reason of being, so* absent. ·For the purposes of taxation in respect of the personal property, income, or gross income of any such person by any

[State] of which such person is not a resident or in which he is not domiciled, compensation for military or naval service shall not be deemed income for services performed within, ... such [State], and personal property shall not be deemed to be located or present in or to have a situs for taxation in such [State].[6]

50 U.S.C.App. § 574 (emphasis added).

In perhaps the most important case interpreting the SSCRA, the Supreme Court noted that the statute "free[s] servicemen from both income and property taxes imposed by any state by virtue of their presence there as a result of military orders. It save[s] the sole right of taxation to the state of original residence whether or not that state exercised the right." *California v. Buzard,* 382 U.S. 386, 393, 86 S.Ct. 478, 15 L.Ed.2d 436 (1966) (quoting *Dameron v. Brodhead,* 345 U.S. 322, 326, 73 S.Ct. 721, 97 L.Ed. 1041 (1953)). Generally, then, the SSCRA grants a serviceperson "broad immunity from [his post state's] income taxation." *Id.* at 387, 86 S.Ct. 478. The purpose is clear: the SSCRA protects servicepeople from "double taxation" by both their home state and the state in which they serve the United States. *See Sullivan v. United States,* 395 U.S. 169, 180, 89 S.Ct. 1648, 23 L.Ed.2d 182 (1969). Additionally, the Supreme Court has held that the SSCRA should be interpreted liberally, with ambiguities resolved "with an eye friendly to those who dropped their affairs to answer the country's call." *Le Maistre v. Leffers,* 333 U.S. 1, 6, 68 S.Ct. 371, 92 L.Ed. 429 (1948) .[7]

---

**6.** The SSCRA represents the codification of views commonly held prior to World War II. As Professor Joseph Henry Beale stated in his influential treatise on the conflict of laws, "[a soldier] cannot acquire a domicile in an Army Post.... He is as able as anyone to acquire a new domicile so far as conditions allow. He cannot acquire it by any act done under military orders since ... he has no choice but obedience. His orders would, so long as he remained in the Army, be enforced by all the powers of the state, and if he were permitted to leave the Army he could no longer remain in the Army quarters. He may, however, like

anyone else, change his domicile by acquiring a residence outside an army post with the intention of making it his home." Joseph Henry Beale, I *Conflict of Laws* 155, quoted in *Hart v. Queen City Coach Co.,* 241 N.C. 389, 392, 85 S.E.2d 319 (N.C.1955).

**7.** A concern much more important during the World War II than it is now, in which the decision to join the PHS represented a voluntary career choice. That difference was reflected in a now-discarded line of case law which held that the SSCRA was inapplicable to career servicepeople, because their service

Against this backdrop, federal courts have consistently held local attempts to tax the property or activities of servicepeople invalid when a sufficient nexus between a serviceperson's local activity and the attempted tax does not exist. The Supreme Court has addressed the issue three times. In the first of these cases, *Dameron v. Brodhead,* 345 U.S. 322, 73 S.Ct. 721, 97 L.Ed. 1041 (1953), the Court summarily rejected an attempt by the City and County of Denver, Colorado, to tax the personal property of a serviceperson resident therein. The serviceperson was a domiciliary of Louisiana, and was present in Denver only under military orders. In upholding the SSCRA's preemption of a Colorado tax on personal property, the Court noted that the SSCRA "saved the sole right of taxation to the state of original residence, whether or not that state exercised the right." *Id.* at 326, 73 S.Ct. 721. This was, the Court noted, a "broad technique," chosen "carefully" by Congress, designed to give servicepersons the greatest possible protection, regardless of whether they actually suffered from their military service. *Id.*

Later, in *California v. Buzard,* 382 U.S. 386, 86 S.Ct. 478, 15 L.Ed.2d 436 (1966), the Court again applied the SSCRA broadly and prevented a state from taxing the property of a serviceperson stationed there under orders. *Buzard* involved California's 2% tax on the market value of every car registered in the state. Buzard was a resident of Washington who was assigned to duty in California. While on temporary duty in Alabama, Buzard purchased an automobile, which he registered in Alabama. Buzard made no attempt to register the car in Washington, for that state required only automobiles which were operated on Washington roads to be registered there. While in California, Buzard was arrested for driving an unregistered

automobile. He refused to pay the 2% tax required for registration of an automobile by California law and was convicted. The Supreme Court held that the tax was invalid as applied to servicemen in California under military orders. Although section 514 allows a state in which a serviceperson is stationed to collect a fee directed to "assuring registration," it does *not* allow a state to collect from a nondomiciliary serviceperson any fee which serves a "revenue purpose." *See id.* at 393, 395, 86 S.Ct. 478. "It is from the burden of taxes serving such ends that nonresident servicemen were to be freed, in the main, without regard to whether their home States imposed or sought to collect such taxes from them." *Id.* at 395, 86 S.Ct. 478. Because the California tax was not designed to promote a system of vehicle registration, it could not be maintained in the face of the SSCRA.[8]

Other federal courts have applied the principles enunciated in *Buzard* to invalidate a range of taxes placed on servicepeople by the state to which they have received orders to report. In *United States v. City of Highwood,* 712 F.Supp. 138 (N.D.Ill.1989), the District Court invalidated a city fee on motor vehicles operated on the streets of Highwood, Illinois, as it applied to servicepeople. Highwood's licensing fees were graduated—$15 for automobiles, with increasing fees charged to vehicles of increasing sizes. The court found this fact important: "[t]hese provisions indicate the fee is not used to register vehicles but rather to raise revenue for the maintenance of Highwood's streets—thoroughfares which would be more heavily damaged by heavy commercial vehicles than by light private vehicles." *See id.* at 141–42. Citing *Buzard,* the court ruled that because states cannot force servicepeople within its borders to pay such reve-

---

in the military was a "career choice" rather than a hardship they endured for the benefit of the nation. *See, e.g., Pannell v. Continental Can Co.,* 554 F.2d 216, 225 (5th Cir.1977).

8. The Court relied on *Buzard* to invalidate an attempt by Mississippi to tax the trailer of a serviceperson stationed therein in a companion case, *Snapp v. Neal,* 382 U.S. 397, 86 S.Ct. 485, 15 L.Ed.2d 445 (1966).

nue-raising fees, Highwood could not impose its licensing fee on non-domiciliary servicepeople.

In *United States v. Onslow Cty. Board of Educ.*, 728 F.2d 628 (4th Cir.1984), the Government challenged a local school board resolution that imposed a tuition requirement on children who were not legal domiciliaries of North Carolina. As was clear from the resolution's preambulatory language, the tuition requirement was targeted against the 4,800 children whose parents were stationed at Camp Lejeune. The County believed a federal law that provided federal financial assistance to school systems which educated military students would be phased out and needed to assure itself of proper funding for the maintenance of its schools. Despite this legitimate public purpose, the Fourth Circuit determined that the tuition requirement frustrated the purposes of the SSCRA. "Military personnel are threatened with a greater burden of supporting the public schools than other citizens if they may be taxed to support education in their state of residence and also in the state where they are stationed with their families. Plaintiffs have argued that military enlistment and morale might suffer as a result." *See id.* at 637. Accordingly, the court determined that the SSCRA preempted the tuition requirement.

Not all state attempts to tax servicepersons resident therein, however, have been found violative of the SSCRA. In *Sullivan v. United States*, 395 U.S. 169, 89 S.Ct. 1648, 23 L.Ed.2d 182 (1969), the Supreme Court upheld Connecticut's sales tax and use tax on the purchase of personal property as it applied to servicepersons within the state. The sales tax issue posed no problem, stated the Court, because "[a] tax on the privilege of selling or buying property has long been recognized as distinct from a tax on the property itself"—a privilege which had its situs in Connecticut. *Id.* at 175, 89 S.Ct. 1648. Resolution of the use tax issue was much closer, however. Because a use tax represents, quite

literally, a tax on the use of personal property, the United States argued that forcing servicepersons to pay a use tax clearly contravened the explicit language of section 514. The Court, however, looked to the legislative history underlying the SSCRA and identified the problem Congress had wished to combat: *recurrent* tax on personal property with which a serviceperson would be saddled on an annual basis as he moved from one post to the next. *See id.* at 177, 89 S.Ct. 1648. In closing, the Court noted how the nature of the use tax, in application, did not offend the SSCRA:

> Section 514 does not relieve servicemen stationed away from home from all taxes of the host State. It was enacted with the much narrower design "to prevent multiple State taxation of the property." And the substantial risk of double-taxation under multi-state ad valorem property taxes does not exist with respect to sales and use taxes. Like Connecticut, nearly every State which levies such taxes provides a credit for sales or use taxes paid on the transaction to another State. Of course, it is true, as we held in [*Dameron*], that section 514 prevents imposition of ad valorem property taxes even though the serviceman's home State does not tax the property. But the predominant legislative purpose nonetheless remains highly relevant in determining the scope of the exemption, and the absence of any significant risk of double taxation under state sales and use taxes generally is therefore strong evidence of congressional intent not to include them.

*Id.* at 180, 89 S.Ct. 1648.

■■■ This is basically the extent of the federal jurisprudence concerning the SSCRA and states' attempts to tax servicepeople. None of these cases directly address the problem facing the Court here, namely, whether the factors involved in a state's determination of domicile, and thus taxation, can violate the SSCRA. The

cases discussed above involve much more *direct* federal-state taxation disputes. One can distill from these cases, however, a few basic principles which guide the analysis used below. First, and most obvious, no state can force a serviceperson to pay a revenue-building tax unless he is deemed to be a resident or domiciliary thereof. *See Buzard,* 382 U.S. at 393, 86 S.Ct. 478. Correlatively, an attempt to tax must bear a close relationship to a serviceperson's activities within the state. *See Sullivan,* 395 U.S. at 175, 89 S.Ct. 1648. Any revenue-raising tax may be imposed only if a serviceperson's domicile, as protected by the SSCRA, is in the taxing state as well. From these principles it can be deduced that any state law or regulation which leads to a serious risk that, on the basis of domicile, a serviceperson will be forced to pay income tax to a state in which he bears no substantial connection violates the SSCRA. Furthermore, the SSCRA likely preempts any state law or regulation that leads to a serious risk that a serviceperson would be subject to double taxation, by both his state of claimed domicile and the state in which he is posted, regardless of whether the state of claimed domicile actually does impose such a tax. *See Dameron,* 345 U.S. at 326, 73 S.Ct. 721.

## 2. Income Taxation and Domicile Under Minnesota Law.

Like many states, Minnesota taxes the income of resident taxpayers. *See* Minn. Stat. § 290.014, subd. 1. The term "resident" means "(1) any individual domiciled in Minnesota [...]; and (2) any individual domiciled outside the state who maintains a place of abode in the state and spends in the aggregate more than one-half of the tax year in Minnesota, unless the individual or the spouse of the individual is in the armed forces of the United States[.]" Minn.Stat. § 290.01, subd. 7. Obviously, this case turns on the proper "domicile" of the PHS officers. "Domicile" is a term

often invoked in the law, yet often without exact clarity. The Supreme Court has defined domicile as "a residence at a particular place accompanied with positive or presumptive proof of an intention to remain there for an unlimited time." *Mitchell v. United States,* 88 U.S. 350, 352, 21 Wall. 350, 22 L.Ed. 584 (1874), quoting *Guier v. O'Daniel,* 1 Binn. 349 (Pa.1808). The law in Minnesota does not significantly differ from the traditional definition.

> The term "domicile" means the bodily presence of an individual person in a place coupled with an intent to make such a place one's home. The domicile of any person shall be that place in which the person's habitation is fixed, without any present intentions of removal therefrom, and to which, whenever absent, that person intends to return. A person who leaves home to go into another jurisdiction for temporary purposes only is not considered to have lost that person's domicile. But if a person moves to another jurisdiction with the intention of remaining there permanently or for an indefinite time as a home, that person shall have lost that person's domicile ... The mere intention to acquire a new domicile, without the fact of physical removal, does not change the status of the taxpayer, nor does the fact of physical removal, without the intention to remain, change the person's status.

Minn.Rule 8001.0300, subp. 2. To assist determinations of a person's domicile, the Minnesota revenue rules set forth a number of presumptions and factors. As applied to the PHS officers, these presumptions and factors comprise the heart of the case before the Court. The United States views these factors and presumptions as flawed, because the presumptions appear to be irrebuttable, and the presence of even a single factor is often sufficient to establish domicile in Minnesota. (*See* Pl.'s Mem. in Supp. at 35 n. 19.) [9]

9. As evidence, the United States points to the determinations made as to Potter and Etchison, on whom tax liability was imposed almost solely on the strength of the marital

### 3. The "Marital Presumption" of Minn.Rule 8001.0300 subp. 2.

The United States first argues that the DOR cannot apply the "marital presumption" of Minnesota Rule 8001.0300, subpart 2 without undermining the purpose of the SSCRA: to prevent servicepeople from "support[ing] the government of the state where he or she [is] stationed under orders unless that officer intend[s] to remain there beyond the termination of those orders." (Pl.'s Mem. in Supp. at 27.) The "marital presumption" is quite straightforward. Subpart 2 states "[t]he presumption is that the place where a person's family is domiciled is that person's domicile. The domicile of a spouse shall be the same as the other spouse unless there is affirmative evidence to the contrary or unless the husband and wife are legally separated or the marriage has been dissolved." Minn.Rule 8001.0300, subp. 2.

The parties' contentions as to the marital presumption are clear. The United States contends that the purpose of the SSCRA would be "undercut by any presumption of host state domicile not dependent on the actions of the PHS officer." (Pl.'s Mem. in Supp. at 29.) The actions of a PHS officer's spouse do not necessarily reflect affirmative action on the part of the officer; as a result, the marital presumption is contrary to the federal case law interpreting and applying the SSCRA, which makes clear that a State may tax a serviceperson only when he has manifestly taken affirmative action to abandon his old domicile and acquire a new one. (See id. at 31.) See also City of Highwood, 712 F.Supp. at 141–43. According to the State, however, nothing in the SSCRA prevents states from examining factors such as the marital residence in deciding whether to tax a resident serviceperson. The DOR seizes on the language in the SSCRA which establishes that a serviceperson shall not be deemed to have established a new domicile in a state in which he is serving a tour of duty "solely" because of his military orders. (See Def's' Mem. in Supp. at 13.) Because the DOR is looking to a factor beyond the mere fact of a serviceperson's stationing—that is, the domicile of his spouse—relying on a presumption of marital domicile is acceptable.

■ Although the DOR's arguments may be convincing in different contexts (see below) as applied to the marital presumption, the United States has made an effective showing that such a presumption cannot be applied consistent with the SSCRA. The marital presumption, used by itself, has absolutely nothing to do with any explicit actions of a serviceperson which could be interpreted as indicating an intent to remain in a given state following his posting. As the facts relating to the PHS officers detailed in the Complaint demonstrate, many PHS officers and their spouses stay at a given post for a lengthy period of time and often purchase a home. Forthun, for example, lived in Minnesota for eight years; Potter has lived in Minnesota for almost twenty. Many of these couples file separate returns, with one spouse claiming Minnesota domicile in order to benefit from the advantageous financial benefits which flow from Minnesota's homestead exemption. See Minn.Stat. §§ 273.124; 273.13 (establishing lower property tax rates for homestead property). As at least one court has recognized, arrangements of this type speak more toward sound financial planning and considerations of convenience rather than an attempt to establish domicile. See Application of Karsten, 22 Kan. App.2d 882, 924 P.2d 1272, 1277 (1996).

Using the domicile of a serviceperson's spouse as a presumption as to a serviceperson's domicile violates both the clear line of case law handed down under the SSCRA as well as substantial public policy concerns. As the United States argues,

presumption. In addition, Dave Anderson, a DOR revenue tax specialist, opined to Ames that Etchison could not have presented any

additional information to overcome the presumption. (See Pl.'s Mem. in Supp. at 35 n. 19.)

"the defendants are attempting to do indirectly what even they would concede they could not do directly: tax at their discretion married PHS officers based on the officers' physical presence under orders in Minnesota." (Pl.'s Mem. in Supp. at 35.) As the cases discussed above indicate, the SSCRA allows the imposition of a tax only when there is a direct nexus between the tax and a serviceperson's activities within the state of his posting. *See, e.g., Sullivan*, 395 U.S. at 180, 89 S.Ct. 1648. With the marital presumption, there is no such connection. Although a married couple, a PHS officer and the spouse thereof are allowed to—and are sometimes forced to—maintain separate domiciles. This even the United States concedes. *See Crouch v. General Elec. Co.*, 699 F.Supp. 585, 595 n. 10 (S.D.Miss.1988) (SSCRA applies only to servicepersons, not spouses), citing *Lester v. United States*, 487 F.Supp. 1033, 1039 (N.D.Tex.1980). Although a PHS officer would (usually) like his spouse to accompany him to his duty post, there is no requirement that she do so—the spouse, as a free person, can choose to accompany her spouse as she sees fit. Furthermore, a serviceperson cohabitating with his spouse does not speak whatsoever to the serviceperson's intention to remain in the state following his tour of duty. As in the case of Potter, Forthun, and Etchison, PHS officers often remain at a given post for extremely long periods of time. It is only natural that a spouse of a PHS officer would accompany the officer to the place of posting in order to establish an ordinary life and promote familial togetherness. Public policy strongly counsels in favor of marital cohabitation, especially when children are involved. *See, e.g., Roberts v. United States Jaycees*, 468 U.S. 609, 619, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984) (First Amendment protects personal affiliations including "the creation and sustenance of a family" and "cohabitation with one's relatives").

The Court is aware that in *Juskowiak v. Comm'r of Revenue*, No. 6607, 1996 WL 125912 (Minn.Tax March 18, 1996), the Minnesota Tax Court determined that the SSCRA did not conflict with the marital presumption. *See id.* at *4. *See also Wolf v. Comm'r of Revenue*, No. 7068, 1999 WL 640030, *2 (Minn.Tax Aug. 17, 1999), (applying the holding in *Juskowiak*). With all due respect, however, this Court must disagree with that conclusion. *Juskowiak* examined neither the case law surrounding the SSCRA nor the extent to which application of these presumptions could seriously frustrate the intentions of Congress and the lives of servicepersons protected by the Act. The cursory treatment given the preemption issue in *Juskowiak* and *Wolf* may have been motivated by the facts of those cases: in both, it was clear that the petitioners had adopted Minnesota as their new domicile. *See, e.g., Juskowiak*, 1996 WL 125912, at *1 (petitioner had been domiciliary of Minnesota when he was activated to National Guard; spent a mere seventy-two hours in Florida attempting to garner Florida contacts so as to change his domicile). Accordingly, the Court respectfully declines to follow the holdings of *Juskowiak* and *Wolf*.

### 4. Factors Based on Activities Within Minnesota.

The United States also asks the Court to declare certain factors found in Minn.Rule 8001.0300, subp. 3 (collectively, as the DOR terms them, the "A–Z factors") violative of the SSCRA. Specifically, the United States challenges the factors which were used in determining that Forthun, Potter, and Etchison were Minnesota domiciliaries during the years in question. These factors include:

3(F): The location of a newly-acquired home, whether owned or rented;

3(J): The state which issued a person's driver's license;

3(M): The state in which a person's car is registered, as well as the physical location of the automobile; and

3(U): The location of organizations and clubs to which a person belongs.

*See id.*

As an initial note, it is important to remember how these four considerations

differ from the marital presumption. Subpart 2 establishes a *presumption* that the domicile of one spouse is that of the other as well; the factors listed in subpart 3 are merely that—*factors*, incidents the DOR may examine to assist in a determination of domicile. A "presumption" is obviously strong medicine and carries a much greater risk of frustrating the purposes of the SSCRA than one of twenty-six indicia of domicile. The concerns here of any one factor at issue here upsetting the system established by the SSCRA are thus much weaker than the problems presented by the marital presumption.

Although the SSCRA goes a long way in alleviating the burdens servicepersons may suffer as a result of their service, there are many things it does *not* do. Specifically, the SSCRA does not *insure* that a serviceperson's domicile will not change during his tenure. The Department of Health and Human Service's own policy manual, issued to PHS officers, carefully cautions officers not to take certain actions which might be taken as indicative of an intent to change domicile. Specifically, Subchapter CC29.9, Instruction 2, highlights some examples of factors which a state might consider in making residency determinations, including the state in which a motor vehicle is registered, the state that issued an officer's driver's license, and the state in which an officer is registered to vote. (*See* Counsel Aff.Ex. F, Attachment 1.) Although this statement by Health and Human Services does not amount to a formal waiver of a serviceperson's rights under the SSCRA, it is certainly indicative of the understandings of the United States about the scope of the Act and what the Act is intended to accomplish. Such statements concerning the United States' understanding of the Act, especially when they inure to the Government's detriment, play a significant role in determining the purpose and force of a statute. *Cf. Onslow Cty. Board of Educ.*, 728 F.2d at 637 (acknowledging the Government's concerns about military enlistment and morale as coloring the court's interpretation of the scope of the Act).

■ The language of section 514 itself buttresses this conclusion. As stated above, that section provides that no person shall be deemed to have acquired a new domicile in the state of his posting "solely" because of his presence there under orders. The presence of the word "solely" was not an idle choice; it has a distinct legal meaning. "Solely" means "exclusively," and directs the Court to look to only the single factor identified. *See Helvering v. Southwest Consol. Corp.*, 315 U.S. 194, 198, 62 S.Ct. 546, 86 L.Ed. 789 (1942); *Carollo v. Cement & Concrete Workers District Council Pension Plan*, 964 F.Supp. 677, 682 (E.D.N.Y.1997). A plain reading of the text of the SSCRA thus leads to the conclusion that a state may tax a serviceperson as long as other factors exist, in addition to physical presence in the state, which leads to the conclusion that a serviceperson has affirmatively chosen the state of posting as his home.

■ Determining that a state could not look to these factors would give the SSCRA a power Congress did not intend: it would render every state incapable of ever taxing the incomes of a serviceperson without the serviceperson's consent. Such a result would be inherently unfair. A serviceperson resident within a state, even if not a domiciliary, reaps tremendous benefits: use of the local economy, roads, parks, schools. Congress has specifically provided that servicepeople are not to be taxed for their use of these public goods if the serviceperson is transient. However, to the extent that a serviceperson in Minnesota under orders has an intention of remaining in the state following the conclusion of his service, he must support the public good and provide for the community's long-term health. *See Welch v. Henry*, 305 U.S. 134, 146, 59 S.Ct. 121, 83 L.Ed. 87 (1938) (taxation is a "way of apportioning cost of government among those who in some measure are privileged to enjoy its benefits and must bear its

burdens"). Minnesotans have to shoulder this responsibility; so, too, should service-persons who intend to remain in the state following their service. To the extent that the "A–Z" factors identify the traditional indicia of domicile, their use is not preempted by the SSCRA.

The Court must add a cautionary note, however. Although use of these action-specific factors is not preempted by the SSCRA categorically, as a matter of law, applying these factors in a manner which does not truly pay heed to a particular serviceperson's intention to remain in Minnesota following the conclusion of his service could *easily* render the factors preempted as applied. The determination as to Etchison, for example, was based on only two factors: his wife's Minnesota domicile—a presumption which cannot be applied—and the fact that he participated in the leadership of his son's baseball league. This second fact is most likely indicative of nothing more than a father's desire to participate in his son's life, not an intention to remain in Minnesota. If, on the other hand, Etchison had served on a county commission or city council, however-er, his membership in a civic organization would be much more indicative of an intent to remain in Minnesota.

These judgments concerning the domicile of a PHS officer are extremely fact-intensive. However, they must always be made with the understanding that the facts involved must point to the conclusion that a PHS officer has truly adopted Minnesota as his new domicile. Other-wise, the letter and spirit of the SSCRA are violated.

### Conclusion

The SSCRA generally protects officers of the Public Health Service, like people who serve in the armed forces, from taxa-tion by states in which they are posted. However, its protections are not total. If a PHS officer acts in a manner which truly indicates an intention to adopt the state of his posting as his permanent home, the SSCRA does not necessarily preclude that state from taxing his income. However, the marital presumption established by Minnesota law does nothing to shed light on this determination; it operates to es-tablish a presumption of domicile in a PHS officer merely because his spouse has jour-neyed to Minnesota with him—a decision reflecting not whatsoever on any intention by the officer to remain in Minnesota. Conversely, the other factors used by Minnesota to determine a person's domi-cile are geared towards assessing the nex-us of a person's contacts. This the SSCRA, and the United States' under-standing of the statute, explicitly provide for. As a result, the SSCRA does not preempt the use of these factors as a basis for a decision to tax.

For the reasons stated, **IT IS HEREBY ORDERED:**

1. The Defendant's Motion for Sum-mary Judgment (Doc. No. 18) is **GRANT-ED IN PART** and **DENIED IN PART;**

2. The Plaintiff's Motion for Summary Judgment (Doc. No. 29) is **GRANTED IN PART** and **DENIED IN PART;**

3. Minn.Rule 8001.0300 subpart 2, which establishes a presumption that the place where a person's spouse is domiciled is that person's domicile as well absent affirmative evidence to the contrary, is **PREEMPTED** by the Soldiers' and Sail-ors' Civil Relief Act of 1940, 50 U.S.C.App. § 574, as it applies to Public Health Ser-vice officers stationed within the State of Minnesota; and

4. The Soldiers' and Sailors' Civil Re-lief Act of 1940, 50 U.S.C.App. § 574, does not preempt the use of the factors listed in Minn.Rule 8001.0300 subpart 3(J), (M), (F), and (U) to determine the domicile of Public Health Service officers.